UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:08-cv-343-JBT

JAMES CARISTO,                                                                                    PLAINTIFF

V.                                          **MEMORANDUM OPINION**

CLARK REGIONAL MEDICAL
  CENTER, INC.,                                                                              DEFENDANT

\* \* \* \* \* \* \* \* \* \*

## I. INTRODUCTION

Plaintiff James Caristo filed this action in Clark Circuit Court on July 25, 2008 (No. 08-CI-00512) against the defendant Clark Regional Medical Center, Inc. ("CRMC"), alleging that on or about July 25, 2007, and July 30, 2007, he presented himself to the emergency room at CRMC for treatment and that on each occasion, CRMC, by and through its employees and agents, failed to provide needed medical care and either refused to treat him or transferred him without providing sufficient emergency care to stabilize and/or treat his emergency medical conditions, all in violation of Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (hereafter "EMTALA").[1]  Plaintiff's complaint further alleges that defendant CRMC's actions or omissions were negligent, reckless, and beneath the standards of care for a hospital under the same or similar circumstances.[2]

Plaintiff seeks compensatory damages, punitive damages, pre-judgment and post-judgment interest, attorney's fees and costs.

---

[1] Although plaintiff's complaint asserts that CRMC violated the EMTALA on July 25 and July 30, 2007, when he presented himself to the emergency room for treatment on each of these dates, in responding to the defendant's motion for summary judgment, plaintiff clarifies that he is claiming that CRMC violated the EMTALA only on July 30, 2007, and that he is not asserting a claim for an EMTALA violation on July 25, 2007.

[2] However, in his response to defendant's motion for summary judgment, plaintiff clarifies that he is not pursuing a negligence claim for medical malpractice against CRMC and that he is only asserting an EMTALA claim against CRMC.

On August 14, 2008, defendant CRMC removed this action from state court pursuant to 28 U.S.C. §1441 because it is an action founded on a claim or right arising under the laws of the United States (EMTALA, 42 U.S.C. § 1395dd) over which this Court has original jurisdiction under 28 U.S.C. §§1331 and 1337.

This matter is presently before the Court on the defendant's motion for summary judgment [DE #18], which has been fully briefed and is ripe for review.

## II.  FACTUAL BACKGROUND

On July 25, 2007, at approximately 9:50 a.m., plaintiff presented himself to the Emergency Department at CRMC, reporting that he had injured his left leg in a motor vehicle accident, when the automobile he was driving struck a deer approximately two (2) hours earlier.  He indicated that he did not lose consciousness or sustain any other type of injuries.  The medical records that were completed in the Emergency Department at that time reflect that plaintiff was taking Klonopine (a mood altering medication for anxiety issues) and Lortab (a pain reliever).

Dr. Frank Loudermilk, a Board-certified Emergency Department physician, performed a complete medical examination on plaintiff which included checking his neck, chest, lungs, heart, abdomen, and extremities.   Plaintiff received two (2) different types of medications for pain, and an X-ray of his left leg was performed, which ray revealed that he had sustained a broken bone in his lower leg.

Based on his findings, Dr. Loudermilk diagnosed plaintiff with a fracture in his lower left leg  and ordered that his leg be immobilized with a splint.  At approximately 12:20 p.m., Dr. Loudermilk discharged Plaintiff to home with instructions to follow-up with Dr. Greg Grau, an orthopedist, on the following day.[3]  Plaintiff was also given a prescription for 30 tablets of Lortab

---

[3] After plaintiff's condition was stabilized by his leg being immobilized with a splint, Dr. Loudermilk discharged plaintiff to home, rather than further treat him for the fracture in his lower left leg at CRMC, because CRMC does not have a Department of Orthopedics, and none of the physicians that provide services in CRMC's Emergency Department are Board-certified Orthopedists or Orthopedic surgeons.  See Affidavit of Nancy Mitchell, p. 1 ¶ 2 (Exhibit 1 to Defendant's Motion for Summary Judgment - DE #18).

for pain control and relief. The discharge instructions further stated that he was to contact his primary care physician or return to the hospital if his problem worsened or if he experienced new symptoms.[4]

The medical records provide that at the time of his discharge, Plaintiff had achieved "optimum tissue perfusion;" he expressed a decrease in the severity of his pain; and "demonstrate[d]/verbalize[d] knowledge of care." Dr. Loudermilk recorded that Plaintiff's condition was "good" when Plaintiff left the hospital at approximately 12:20 p.m. In an effort to further assist him after he was discharged, an ambulance transported plaintiff to his residence.

Subsequently, five days later, at approximately 5:21 a.m., on July 30, 2007, plaintiff was delivered to the Emergency Department at CRMC by officers from the Winchester Police Department, who had responded to a call by plaintiff's mother for assistance with his erratic behavior. According to the history contained in the medical records, plaintiff was "agitated," and "out of control at his [mother's] house." He also reported experiencing hallucinations including seeing bugs and communicating with an imaginary person by the name of "Joe." The notes in the medical records also describe him as being angry and state that he "refused to acknowledge that he had any problems that needed [to be] addressed."

On July 30, plaintiff was in the Emergency Department for more than 5½ hours during which time he was examined and treated by two (2) Emergency Department physicians, Dr. Ronald Hamilton and Dr. Robert Dennison. The medical records contain no reference to any complaints by plaintiff with respect to the prior injury to his left leg for which he was treated at CRMC and released on July 25, 2007. Pursuant to orders from Drs. Hamilton and Dennison, plaintiff underwent various tests and diagnostic checks in an effort to ascertain the cause of his behavior.

---

[4]While Plaintiff testified during his deposition that he did not see Dr. Grau on the following day, per Dr. Loudermilk's instructions, and that he had been unable to fill the prescription given to him by Dr. Loudermilk, he neither contacted CRMC nor returned to the Emergency Department until July 30, 2007. (Deposition of James Caristo, pgs. 61-62 & 66-68.)

These tests included Complete Blood Count ("CBC"), Comprehensive Metabolic Panel ("CMP"), Electrocardiogram ("EKG"), chest X-ray, as well as drug and alcohol screenings. Plaintiff was administered nutrients via intravenous fluid, and Dr. Dennison ordered that he undergo a consult with social services. Plaintiff was interviewed by Charlene Messner, a Licensed Clinical Social Worker. Among other things, Ms. Messner documented that he became "angry" and began to remove his IV. She further noted that "he expressed anger towards his mother and started demanding to leave." Dr. Dennison's diagnosis of plaintiff included "psychosis," "hostility," and "substance abuse." Due to the fact that psychiatric evaluation and treatment are outside of the capabilities of CRMC,[5] it was decided that plaintiff would benefit from further evaluation and treatment at a behavioral health facility. Consequently, a Verified Petition for Involuntary Hospitalization or Involuntary Admission was filed with the Clark County District Court. (*See* Exhibit "2" to Defendant's Motion for Summary Judgment [DE #18]).

In support of that Petition, Ms. Messner attested that plaintiff was "displaying aggressive behavior" and "continues to be agitated and uncooperative." She further indicated that she believed plaintiff was experiencing some form of mental illness. District Court Judge David G. Perdue found that there was probable cause to believe that plaintiff presented a danger or threat of danger to himself and/or others. As a result, he ordered that plaintiff be transferred in the presence of the Sheriff or other law enforcement officer to Comprehensive Care, a Community Mental Health Center

---

[5] CRMC is a 75-bed acute care hospital located in Winchester, Clark County, Kentucky. While it operates a 24-hour Emergency Department, CRMC is a small, community hospital that is without many of the services and departments available at larger facilities located in larger cities, such as Lexington, Kentucky, and surrounding areas. For instance, CRMC does not have an orthopedics department, and none of the emergency physicians that treat patients there are Board-certified Orthopedic surgeons. (¶ 2 of Affidavit of Nancy Mitchell (Exhibit "1" to Defendant's Motion for Summary Judgment [DE #18]. Similarly, CRMC does not provide in-patient psychiatric care; in fact, no psychiatrists currently have privileges to treat their patients at CRMC. *Id.* at ¶ 4.

located in Winchester, Kentucky, to be examined by a Qualified Mental Health Professional. (*See* Exhibit "3" to Defendant's Motion for Summary Judgment [DE #18]).

Thereafter, on July 30, 2007, at approximately 11:00 a.m., Dr. Dennison transferred plaintiff in accordance with Judge Perdue's Order. Plaintiff's condition at that time was documented by Dr. Dennison to be "good." Plaintiff was delivered to Comprehensive Care by a deputy from the Clark County Sheriff's Office. According to the Certification filed by Debi McCord, a certified social worker at Comprehensive Care, she did not regard Plaintiff to be mentally ill. (*See* Exhibit "4" to Defendant's Motion for Summary Judgment [DE #18]). Based on this Certification by Ms. McCord, District Judge Perdue declared that plaintiff did not meet the criteria for a 72-hour hold, and he was ordered to be released. (*See* Exhibit "5" to Defendant's Motion for Summary Judgment [DE #18]). According to plaintiff's testimony, he left Comprehensive Care with a family member and returned to his mother's home approximately two (2) hours after his arrival there. (Deposition of James Caristo, pg. 95).

Upon being discharged from Comprehensive Care, plaintiff did not return to CRMC, and he did not contact his primary care physician or go to any other clinic, hospital or facility that day. Instead, he returned home. On the following day, July 31, 2007, plaintiff presented himself to Saint Joseph East Hospital ("St. Joseph East") in Lexington, Kentucky, where he was hospitalized for five (5) days and was treated by an orthopedic surgeon for the broken bone in his lower left leg.

### III.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**A.     Standard for Summary Judgment**

In *Menuskin v. Williams*, 145 F.3d 755 (6th Cir. 1998), the Sixth Circuit reiterated the standard to be employed when considering a motion for summary judgment, as follows:

> . . . Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we view the evidence so that all justifiable inferences are drawn in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Menuskin*, 145 F.3d at 761.  *See also Street v. J. C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989).

With this standard in mind, the court will proceed to the defendant's motion for summary judgment.

As grounds for its motion for summary judgment, CRMC points out that the decisions concerning plaintiff's care and treatment at CRMC during each of his visits to the Emergency Department on July 25 and July 30, were made and executed pursuant to orders from the treating physicians, Drs. Loudermilk, Hamilton and Dennison, including the decision to discharge him home on July 25, 2007 and to transfer him to Comprehensive Care on July 30, 2007.  CRMC asserts that it cannot be held to be vicariously liable for any decisions or actions taken by these physicians because they are not employees of CRMC, but instead, are independent contractors who possess autonomy in making decisions concerning the care and treatment of the patients with whom they interact at CRMC.  Based on the fact that the physicians who have privileges at CRMC are independent contractors, CRMC also contends that they are neither "actual" or "ostensible" agents of CRMC.

CRMC further notes that at the time of treatment at CRMC, plaintiff was presented with a form advising him of the independent status of CRMC's physicians and informing him that he would be billed separately for the services rendered by his treating physicians in the Emergency Department at CRMC.  Therefore, CRMC asserts that plaintiff knew that his treating physicians at CRMC were neither employees nor agents of CRMC.

Defendant's motion for summary judgment is supported, in part, by the <u>Affidavit of Nancy Mitchell</u>, which states, as follows:

> 1.   I am the Director of Corporate Compliance and Risk Management of Clark Regional Medical Center, Inc. ("CRMC").  I have been employed at CRMC since 2003.  I have personal knowledge and/or information regarding all matters contained herein.
> 2.   CRMC does not have a Department of Orthopedics.  None of the physicians that provide services in CRMC's Emergency Department are Board certified Orthopedists or Orthopedic surgeons.
> 3.   It is my understanding and belief that Plaintiff, James Caristo, was referred by Dr. Frank Loudermilk to Dr. Greg Grau on July 25, 2007 because Dr. Grau was the on-call Orthopedist.  I further understand and believe that Dr. Loudermilk spoke with

> Dr. Grau about Mr. Caristo's condtion before he was discharged from the Emergency Department.
> 4.   CRMC does not have in-patient psychiatric care.  There are currently no psychiatrists who have privileges to treat their patients at CRMC.
> 5.   Dr. Frank Loudermilk, Dr. Ronald Hamilton and Dr. Robert Dennison are not employees of CRMC.  Likewise, none of these physicians were employed by the hospital in July 2007.
> 6.    It is my understanding and belief that these physicians are employed by or affiliated with a physician group known as "TeamHealth."  This group provides emergency medical services to patients who present to CRMC's Emergency Department.  This group provides similar services at other hospitals in Kentucky.
> 7.   These physicians have the autonomy to treat their patients in accordance with their education, training, and experience and based on their professional judgment.  CRMC neither directs nor controls the decisions made by these physicians.
> 8.   There is no employer-employee relationship between CRMC and these physicians.  Rather, these physicians are independent contractors.
> 9.   All individuals who seek care at CRMC's Emergency Department are advised that the physicians who provide services to them are independent contractors.  This information is explicitly stated in the consent forms presented to each patient.
> 10.   Individuals who receive care at CRMC's Emergency Department receive a bill from the hospital with respect to the nursing services, equipment, medication and supplies provided to them.  They receive a separate bill directly from the physician group for the professional physician services provided to them.
>      Further, the affiant sayeth naught.

<u>Affidavit of Nancy Mitchell</u>, Exhibit 1 to <u>Defendant's Motion for Summary Judgment</u> [DE #18].

CRMC also submits that it is entitled to summary judgment because plaintiff's claim against it is unsupported by any expert testimony, and he cannot satisfy the elements of his EMTALA claim in the absence of expert testimony.

In response, plaintiff clarifies that he is not asserting a negligence claim for medical malpractice against CRMC, meaning that his only claim against CRMC arises under EMTALA. Plaintiff also states that while his visit to CRMC's emergency room on July 25 is germane in that the hospital staff on July 30 at CRMC had to know about his prior orthopedic injury (presumably the fracture in his lower left leg sustained on July 25), the care and treatment he received on July 25 is not an issue in this case. Further plaintiff notes that the independent status of the emergency room physicians at CRMC is not an issue. Nevertheless, irrespective of the independent status of CRMC's physicians, plaintiff contends that CRMC is not entitled to summary judgment because there is a genuine issue of material fact as to whether CRMC's physicians were ostensible agents of CRMC.

**B.      Discussion**

Based on plaintiff's confirmation that he is only asserting a claim arising under EMTALA against defendant CRMC and is not also pursuing a negligence claim for medical malpractice, the court must review the requirements necessary to establish a violation of EMTALA.

### Applicable Law

In 1986, Congress enacted The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, ("EMTALA"), commonly known as the "Patient Dumping" Act. EMTALA was enacted "to address a growing concern with 'patient dumping.'" *Estate of James Gray v. Saint Joseph HealthCare, Inc.*, 2008 Ky. App. LEXIS 371 (Ky Ct. App. 2008)(citations omitted). Thus, the purpose underlying EMTALA was to prohibit hospitals from transferring a patient to another institution or refusing to treat a patient because the patient is unable to pay for health care services.

EMTALA explicitly provides that a federally-funded hospital with an Emergency Department must provide all patients with "an appropriate medical screening examination" within the hospital's capability to determine whether or not an "emergency medical condition exists." 42 U.S.C. § 1395dd. If such a condition[6] is present, the hospital must further provide, based on available staff and resources, the treatment necessary to "stabilize" the medical condition before transferring or discharging the patient. *Id*.

Litigation arising under EMTALA has established that determinations regarding whether the requisite care was provided cannot be based solely on the outcome experienced by the patient, even if the outcome was negative. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990). Additionally, it is well-settled that EMTALA claims are not synonymous with claims for medical malpractice, and they do not have the same evidentiary elements or burdens of proof. *Lewellen v. Schneck Medical Center*, 2007 U.S. Dist. LEXIS 60358 (S.D. Ind. 2007). Thus, there

---

[6] An "emergency medical condition" is defined by Section (e)(1) of EMTALA as a condition with "acute symptoms" of a "sufficient severity" such that the absence of "immediate medical attention" could reasonably be expected to result in serious health risks and/or disability.

is no EMTALA violation even if the treating physician(s) failed to detect and/or misdiagnosed an emergency condition. *Estate of James Gray v. Saint Joseph HealthCare, Inc., supra,* at *9; see also *Guadalupe v. Dr. Samuel Negron Agosto*, 299 F.3d 15, 21 (1st Cir. 2002).

## Analysis

Given the language of EMTALA, in order for plaintiff to prevail on his claim, he must establish that:

1. he did not receive an appropriate medical screening examination at CRMC on July 30;

2. he suffered from an emergency medical condition while at CRMC;

3. CRMC had available personnel, equipment, and resources to treat or stabilize such condition;

4. his emergency medical condition was not properly stabilized prior to his discharge or transfer; and

5. he sustained injuries as a direct and proximate result thereof.

When plaintiff was delivered to the Emergency Department at CRMC on July 30, 2007, he was "angry," "agitated," and exhibited "aggressive behavior." Plaintiff was interviewed by Charlene Messner, a Licensed Clinical Social Worker, who believed at that time that plaintiff was a person with a mental illness. Ms. Messner documented that he became "angry" and began to remove his IV. She further noted that "he expressed anger towards his mother and started demanding to leave." At that time, CRMC had no medical personnel in its facility qualified to diagnose or treat the behavior plaintiff was exhibiting and/or diagnose or treat a patient with a mental illness.[7]

Due to the fact that psychiatric evaluation and treatment is outside of the capabilities of CRMC, it was decided that plaintiff would benefit from further evaluation and treatment at a behavioral health facility. Consequently, a Verified Petition for Involuntary Hospitalization or

---

[7] To reiterate, CRMC does not have in-patient psychiatric care, and there are currently no psychiatrists who have privileges to treat their patients at CRMC. See Affidavit of Nancy Mitchell, p. 1, ¶ 4 (Exhibit 1 to Defendant's Motion for Summary Judgment [DE #18]).

Involuntary Admission was filed with the Clark County District Court. (*See* Exhibit "2" to <u>Defendant's Motion for Summary Judgment</u> [DE #18]).

In support of that Petition, Ms. Messner attested that plaintiff was "displaying aggressive behavior" and "continues to be agitated and uncooperative." She further indicated that she believed plaintiff was experiencing some form of mental illness. Based on the statements contained in Ms. Messner's petition, on July 30, Clark District Judge Davie G. Perdue granted the petition and ordered that plaintiff be transferred to Comprehensive Care for further evaluation. Thus, plaintiff was not discharged from CRMC on July 30 based on the decisions of Drs. Hamilton and Dennison. Instead, plaintiff was released and transferred to Comprehensive Care *pursuant to a court order*, after he had been screened at the Emergency Department at CRMC where the medical staff there thought that he was experiencing some form of mental illness and concluded that CRMC did not have the resources to adequately diagnose or treat his condition.

The court concludes, contrary to plaintiff's assertion, that he was not "dumped" by CRMC on July 30. He was screened, tentatively diagnosed, and then transferred to a facility, in compliance with a court order, that had qualified personnel who were trained to assess a patient with a mental illness and/or a patient who was experiencing emotional problems.

Additionally, the court opines that the elements necessary to prove an EMTALA claim must be established by expert testimony, as they involve the analysis of complex medical decisions and treatment which are not within the general knowledge and understanding of lay persons. Thus, plaintiff cannot satisfy his evidentiary burden in the absence of expert testimony.

The record reflects that plaintiff's response to the defendant's motion for summary judgment is supported by the affidavit of a Registered Nurse, Barbara Tinnell, and by plaintiff's brother, Ralph Caristo, a home construction builder in Central Kentucky. The court concludes that neither of the foregoing affidavits is sufficient to satisfy plaintiff's burden of proof because neither of these

affidavits are from qualified medical experts from whom expert testimony must be obtained in order to determine whether CRMC violated EMTALA on July 30, 2009.[8]

Further, in his response to defendant's motion for summary judgment, plaintiff appears to support his EMTALA claim by pointing out that on July 31, the day after he was released from CRMC, he presented himself to the emergency room at St. Joseph East where he was hospitalized for five (5) days and was treated by an orthopedic surgeon for the broken bone in his lower left leg. In relevant part, the Discharge Summary of plaintiff's hospitalization at St. Joseph East states:

> HISTORY OF PRESENT ILLNESS: Mr. Caristo is a 45-year-old white male who presented to the Emergency Room with his family after not having any alcohol for four days prior to admission. He was involved in a motor vehicle accident four days prior to admission and sustained a tibial fracture. He was seen at Clark Regional Medical Center and sent home. He presented to the University of Kentucky on July the 30th. He was in early DT's and was sent home. He called his personal physician, Dr. Asher, who informed him to come to the ER here and the family brought him in with concerns of alcohol withdrawal. The patient apparently having [sic] visual hallucinations as an outpatient and began having them in the Emergency Room. He was slightly hypoxic on admission. The patient was admitted to the Intensive Care Unit where he became delirious and uncontrollable and having again quite a few hallucinations and just very difficult to care for. The patient was given some Ativan without a good response. He was given a second dose of Ativan and then proceeded to have a seizure that lasted 30 seconds. At this point there was concerns [sic] that his delirium tremens could lead to status epilepticus and he was placed on a low dose Versed drip with excellent results. The patient was sedated and slept comfortably and was breathing comfortably with an improved gas after this. He did not require intubated [sic] and was kept on Versed drip during his first 24 hours. Orthopedics was consulted who evaluated the patient and informed us that they would treat him after he was medically stable. The patient was started on IV Rally Pak daily and was found to be low on Potassium. He was given Potassium placement and was placed in restraints.

---

[8] Although Barbara Tinnell, R.N., has training in the medical field, her training is limited to that of a Registered Nurse; therefore, she does possess the knowledge and skill of a licensed physician. The court concludes that in order to establish his EMTALA claim, plaintiff would need expert medical testimony from a trained, licensed physician and preferably from a physician who has knowledge acquired from having practiced in the emergency room setting. As for the affidavit of plaintiff's brother, Ralph Caristo, his statements are of no value in reference to plaintiff's EMTALA claim.

> On 8/1/07, his Versed drip was weaned and discontinued. The patient seemed to be stable and was placed on IV Valium every six hours. He was placed on a regular diet and given Dilaudid for pain control of his left tibia.
>
> On 8/2/07, his Valium was discontinued and he was placed on oral Serax 15 mg every 8 hours. His Ativan, Morphine, and Phenobarbital were . . . . . . [incomplete copy] . . . proximal left tibia with extension through the tibial plateau, non-displaced fracture of the tip of the fibular head.
>
> ASSESSMENT:
> 1. Tibial fracture status post fixation.
> 2. Alcohol abuse and withdrawal.
>
> PLAN: Will discharge him home, follow up with his primary physician in two to three weeks time, discontinue his Serax here, home health referral with Nurses Registry with an extra wide walker prescribed. The patient is to use Percocet as described by orthopedics. They want to see him back in ten to fourteen days to follow up with his fracture.

Exhibit 3 to Plaintiff's Response to Defendant's Motion for Summary Judgment [DE #21].

The court concludes that plaintiff's hospitalization at St. Joseph East and surgery on the fractured bone in his lower left leg are of no consequence to plaintiff's EMTALA claim because the subsequent care and treatment of the broken bone in plaintiff's lower left leg are related to plaintiff's visit to the emergency room at CRMC on July 25. Plaintiff specifically states that his EMTALA claim concerns his visit to the emergency room at CRMC on July 30, rather than his visit to the emergency room at CRMC on July 25. Although the discharge summary from St. Joseph East makes reference to the fact that while in the emergency room at St. Joseph East, plaintiff "was admitted to the Intensive Care Unit where he became delirious and uncontrollable and having again quite a few hallucinations and just very difficult to care for," the court concludes that such behavior that plaintiff exhibited on July 31 is of no consequence to his visit to the Emergency Department at CRMC on July 30, as it is unknown whether plaintiff had ingested any alcohol and/or prescription medication subsequent to his release from Comprehensive Care on July 30.[9]

---

[9] It is worth noting that the Discharge Summary from St. Joseph East also states: "He presented to the University of Kentucky on July the 30th. He was in early DT's and was sent home." Based on that statement, it would appear that after plaintiff was released by Comprehensive Care on July 30, he then presented himself to the University of Kentucky ("UK") for evaluation and treatment and that UK also discharged him and sent him home.

Plaintiff also contends that CRMC is not entitled to summary judgment because there is a genuine issue of material fact as to whether CRMC's physicians were ostensible agents of CRMC. The record reflects that when plaintiff visited CRMC's Emergency Department, he was presented with a consent form which advised him that the physicians at CRMC were **not** employees or agents of CRMC. More particularly, this consent form states, in relevant part, as follows:

> INDEPENDENT STATUS OF PHYSICIANS: The medical treatment rendered to the patient during his hospitalization will be provided by independent practitioners. They are not employees or agents of the Hospital. These independent practitioners may include, but are not limited to: anesthesiologist(s), cardiologist(s), radiologist(s), pathologist(s), neurologist(s), hospitalist(s), emergency room physician(s) and other professionals. You will be billed separately for the services provided by these physicians.

(*See* Exhibit "7" to Defendant's Motion for Summary Judgment [DE #18]).

Consequently, the court in unpersuaded by plaintiff's argument that there is a genuine of material fact concerning the status of the medical personnel at CRMC. Irrespective of any name tags or clothing worn by medical personnel in the Emergency Department at CRMC, plaintiff was on notice that the medical personnel at CRMC were neither employees nor agents of the hospital.

## IV. CONCLUSION

In conclusion, based on the fact that plaintiff's EMTALA is unsupported by expert testimony and based on the fact that there is no genuine issue of material fact concerning the "independent status" of the physicians at CRMC, the court concludes that the defendant is entitled to summary judgment on plaintiff's EMTALA claim.

An Order and Judgment consistent with this Memorandum Opinion will be entered on the same date herewith.

This 24th day of August, 2009.

Signed By:
*James B. Todd*
United States Magistrate Judge